IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| The Estate of Michael Steven Everhard by Steven Everhard Executor; and Steven Everhard, Michael A. Everhard, and Amy Gardner, Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; Rich Retzlaff; Jorge Sandoval; Randy Wiley; Tom Brower; and Laurie Garcia,<br><br>Defendants. | CASE NO. _____<br><br>**JOINT NOTICE OF REMOVAL** |

All Defendants jointly remove this civil action under 28 U.S.C. §§ 1331, 1441, 1442, and 1446. This Court has subject matter jurisdiction, and the case is removable because:

(1) Plaintiffs' Petition at Law ("Petition") challenges actions taken by Defendants at the direction of a federal officer, for which Defendants will have a colorable federal defense (28 U.S.C. § 1442(a)(1)); and

(2) The Petition raises substantial and disputed issues of federal law related to national emergency declarations, federal critical infrastructure designations, and the Defense Production Act that must be decided by a federal forum (28 U.S.C. § 1331).

Removal is timely. Defendants were served with the Petition on or after December 31, 2020. This Notice is being filed within 30 days of service. *See* 28 U.S.C. §1446(b)(1); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

## BACKGROUND

The United States continues to struggle with a global pandemic whose size and scope are without modern precedent. Millions have been infected with the novel coronavirus, and more than 375,000 Americans have died of COVID-19. The economic and human fallout from the pandemic has been severe. This case is brought by relatives of Michael Everhard, who worked at a Tyson meat processing facility, and alleges that Mr. Everhard contracted COVID-19 at work and later died of the disease. His death is a tragedy.

But Plaintiffs' allegations—including allegations of willful misconduct—are inaccurate and incorrect, and Tyson vigorously disputes Plaintiffs' claims. Tyson has worked from the beginning of the pandemic to follow federal workplace guidelines and has invested millions of dollars to provide employees with safety and risk-mitigation equipment. Tyson's efforts to protect its workers while continuing to supply Americans with food in the face of the pandemic continue to this day.

Removal is proper because this case seeks to countermand federal statutes and federal directions Tyson received as part of a national emergency response to an unprecedented pandemic. The Petition alleges in effect that Tyson should have shut down its facility in Storm Lake, Iowa during the COVID-19 pandemic or operated it differently. But the facility was operating as part of the federally designated "critical infrastructure" at the direction of, and under the supervision of, the U.S. Department of Homeland Security and the U.S. Department of Agriculture. Tyson worked hand-in-hand with federal officials from the time of the declaration of a national emergency on March 13 to safely continue operations to secure the national food supply. The President and the Secretary of Agriculture provided detailed instructions for meat

- 2 -

Case 5:21-cv-04002-LRR-KEM    Document 1    Filed 01/20/21    Page 2 of 18

and poultry processing facilities to continue operating, incorporating industry-specific guidance from the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA"). And after attempts by states to interfere with this national prerogative, the President again confirmed—more than a month before Mr. Everhard was diagnosed with COVID-19—"[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans" and "continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA," and that any "closures [of such facilities] threaten the continued functioning of the national meat and poultry supply chain" and "undermin[e] critical infrastructure during the national emergency." *Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* ("Food Supply Chain Resources"), 85 Fed. Reg. 26,313, 26,313, 2020 WL 2060381, at *1 (Apr. 28, 2020).[1]

Because Tyson continued to operate the Storm Lake facility following federal critical infrastructure directions and supervision from federal officers, including directives from the President and the Secretary of Agriculture and guidance from the CDC and OSHA, a federal court must resolve this case.

## ARGUMENT

### I. Federal officer removal is proper under 28 U.S.C. § 1442(a)(1).

Under 28 U.S.C. § 1442(a)(1), a civil action may be removed to federal court if the action is asserted against a person acting under the direction of a federal officer:

---

[1] https://www.whitehouse.gov/presidential-actions/executive-order-delegating-authority-dpa-respect-food-supply-chain-resources-national-emergency-caused-outbreak-covid-19/

> A civil action . . . that is against or directed to any of the following may be removed . . . :
>
> (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

28 U.S.C. § 1442(a)(1) (emphasis added).

Here, federal officer removal is proper because (1) Tyson "acted under the direction of a federal officer," (2) "there was a causal connection between [Tyson's] actions and the official authority," (3) Tyson "has a colorable federal defense to [Plaintiffs'] claims," and (4) Tyson "is a 'person,' within the meaning of the statute." Jacks v. Meridian Res. Co., 701 F.3d 1224, 1230 (8th Cir. 2012) (citing Dahl v. R.J. Reynolds Tobacco Co., 478 F.3d 965, 967 n.2 (8th Cir. 2007)).

**Federal Direction**. On March 13, 2020, the President "proclaim[ed] that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020."[2] Soon after, on March 16, the President issued "Coronavirus Guidelines" emphasizing that employees in "critical infrastructure industr[ies]"—including companies like Tyson that are essential to maintaining food-supply chains and ensuring the continued health and safety of all Americans—have a "special responsibility" and "should follow CDC guidance to protect [employees'] health at work." Exec. Office of Pres., *The President's Coronavirus Guidelines for America* at 2 (Mar. 16, 2020).[3]

This "critical infrastructure" designation derives from the USA Patriot Act passed after 9/11, *see* 42 U.S.C. § 5195c(e), and the administration of critical

---

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

[3] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

infrastructure protection is through the U.S. Department of Homeland Security, which was created in 2002. "Food and Agriculture" is one of the sixteen recognized "sectors" of critical infrastructure and is subject to a 2013 Presidential Policy Directive intended to "advance[] a national unity of effort to strengthen and maintain secure, functioning, and resilient critical infrastructure."[4] Coordinating protection of the Food and Agriculture Sector has been assigned to the U.S. Departments of Agriculture and Health and Human Services, which have an extensive plan[5] "to protect against a disruption anywhere in the food system that would pose a serious threat to public health, safety, welfare, or to the national economy."[6]

Accordingly, from the time of President Trump's disaster declaration on March 13, Tyson was in close contact with federal officials regarding continued operations as critical infrastructure and acting at the direction of those officials. For example, on March 15, in response to significant hoarding of food and other items, the President met with food industry executives—including Tyson—to discuss the stability of the supply chain. The President provided the following statement regarding "hand-in-hand" cooperation with the federal government to keep supply chains operating:

> All of them are working hand-in-hand with the federal government as well as the state and local leaders to ensure food and essentials are constantly available . . . . We had a long conversation with them and they're going to work 24 hours around the clock, keeping their store stocked.[7]

---

[4] https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[5] https://www.cisa.gov/critical-infrastructure-sectors

[6] https://www.cisa.gov/sites/default/files/publications/nipp-ssp-food-ag-2015-508.pdf at 13.

[7] https://www.foodbusinessnews.net/articles/15621-trump-meets-with-food-company-leaders

Over the next weeks, Tyson was in frequent contact with federal officers regarding the best way to safely continue operations, in particular with the Department of Agriculture's Food Safety Inspection Service ("FSIS"). In fact, FSIS employees were on-site at Tyson's facilities, and Tyson's employees carried letters identifying them as "critical infrastructure" workers, so that those employees could explain their exemption from local lockdowns should any authorities question them.

Federal officials also continued to emphasize the need for companies in the Food and Agriculture Sector to keep operating pursuant to unified, federal guidance. For example, in an April 7 statement, Vice President Pence stressed that "we need [food industry workers] to continue, as a part of what we call our critical infrastructure, to show up and do your job and know that we're going to continue to work tirelessly in working with all of your companies to make sure that that workplace is safe."[8] Congress even appropriated supplemental funding to FSIS to accommodate the continued presence of FSIS at facilities, including Tyson's facilities, during the pandemic.

But notwithstanding the close collaboration between Tyson and federal officials to safely continue operations, state and local officials began asserting contradictory authority with respect to meat and poultry processing facilities. Those state actions led to an Executive Order re-emphasizing federal supremacy with respect to meat and poultry facilities. On April 28, more than a month before Mr. Everhard was diagnosed with COVID-19, President Trump expressly invoked his authority under the Defense Production Act ("DPA") and again directed that it was federal policy that meat and poultry processing companies continue operating subject to the supervision

---

[8] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-april-7-2020/

of the Secretary of Agriculture. *See Food Supply Chain Resources*, 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The executive order states in relevant part:

> It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain **continue operating and fulfilling orders** to ensure a continued supply of protein for Americans. . . . [R]ecent actions in some States have led to the complete closure of some large processing facilities.
>
> \*   \*   \*
>
> Such closures **threaten the continued functioning** of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency.
>
> \*   \*   \*
>
> [T]he Secretary of Agriculture shall take all appropriate action . . . to **ensure that meat and poultry processors continue operations** consistent with the guidance for their operations jointly issued by the CDC and OSHA.

*Id.* (emphases added).

Consistent with the *Food Supply Chain Resources* executive order and the prior directives, Secretary of Agriculture Sonny Perdue then promptly issued two letters: one to meat and poultry processing companies directing them to continue operating pursuant to the federal directives, and one to state and local officials across the nation reiterating their obligation to work with the Secretary to ensure meat and poultry processing companies' compliance with federal directives. *See* U.S. Dep't of Agriculture, Press Release No. 0243.20 (May 6, 2020) (announcing that the Secretary had issued a "Letter to Governors" and "Letter to Stakeholders").[9] Secretary Perdue's Letter to Stakeholders again emphasized that the "Nation's meat and poultry

---

[9] https://www.usda.gov/media/press-releases/2020/05/06/secretary-perdue-issues-letters-meat-packing-expectations

- 7 -

processing facilities and workers play an integral role in the continuity of our food supply chain." U.S. Dep't of Agriculture, Letter to Stakeholders (May 5, 2020).[10]

The U.S. Department of Agriculture also entered into a Memorandum of Understanding with the U.S. Food and Drug Administration ("FDA") setting forth the respective roles of each agency in utilizing the DPA to regulate food producers during the COVID-19 outbreak. *See Memorandum of Understanding Between FDA and USDA Regarding the Potential Use of the Defense Production Act with Regard to FDA-Regulated Food During the COVID-19 Pandemic* (May 18, 2020).[11] Notably, the agreement reiterated that "actions by States or localities could lead to the closure of food resource facilities," such closures "could threaten the continued functioning of the national food supply chain, undermining critical infrastructure during the national emergency," and the Department of Agriculture retained "*exclusive delegated authority*" under the DPA to issue orders regarding domestic food producers. *Id.* at 1-2, 4 (emphasis added).

Accordingly, Tyson was operating its facilities—including the Storm Lake facility—as critical infrastructure at the direction of federal officials since the outset of the March 13 emergency declaration. As such, Tyson was "acting under the direction of a federal officer," 28 U.S.C. § 1442(a)(1), and "helping the Government to produce an item that it needs" for the national defense, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153 (2007); *see also Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486-87 (1st Cir. 1989) (holding that "the reach of section 1442(a)(1) extends to private persons . . . who act under the direction of federal officers," including companies ordered to "facilitate" or "offer[] technical assistance" to federal agents exercising statutory authority).

---

[10] https://www.usda.gov/sites/default/files/documents/stakeholder-letters-covid.pdf

[11] https://www.usda.gov/sites/default/files/documents/mou-between-fda-usda-dpa.pdf

Indeed, it is well established that private providers to the government of military products (*see, e.g.*, *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016)) or health benefits (*see, e.g.*, *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230-35 (8th Cir. 2012)) can invoke federal officer removal. Here, Tyson was acting at the direction of federal officers in a time of emergency to provide the food security that the government desired. And with respect to the DPA in particular, the President made clear on March 24 that companies were acting in the shadow of potential DPA orders: "The Defense Production Act is in full force, but haven't had to use it because no one has said NO!"[12] The Fifth Circuit has recognized that such dynamics amount to government orders and actions—that "the threat of mandatory powers would be used as a 'big stick' to induce voluntary cooperation," and that the DPA's "broad authority" can be exercised through either "formal, published regulations" or "informal and indirect methods of securing compliance." *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 992-93, 998 (5th Cir. 1976). That is especially true in a time of emergency because "a cumbersome and inflexible administrative process is antithetical to the pressing necessities." *Id.* at 998. Indeed, the President formally invoked the DPA on April 28—more than a month before Mr. Everhard was diagnosed with COVID-19—only in response to state and local governments' failure to heed the Executive Branch's earlier directives.

Consistent with the finding of federal officer removal in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), the federal government here (1) provided "detailed specifications" governing Tyson's ongoing operations—through the federal direction that the CDC and OSHA guidelines would govern operations, and promulgation of exceedingly detailed guidelines specific to meat and poultry processors; and (2) exercised "on-going supervision" of those operations through the

---

[12] https://mobile.twitter.com/realdonaldtrump/status/1242421041193988096

Secretary of Agriculture, *id*. at 400, who was delegated power by the Department of Homeland Security to preserve the Food and Agriculture Sector during the pandemic and by the President to "take all appropriate action . . . to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The Petition seems to be challenging Tyson's failure to shut down the Storm Lake plant and the various measures that were taken at the Storm Lake facility. [*See, e.g.*, Pet. ¶¶ 26-29, 31, 36] But those alleged actions were taken pursuant to the authority, orders, detailed regulation, and supervision of the President and U.S. Departments of Homeland Security and Agriculture. Tyson was therefore "acting under" federal officers, and is entitled to have this case heard in federal court. 28 U.S.C. § 1442(a)(1).

**Connection or Association**. Following the text of 28 U.S.C. § 1442(a)(1), it suffices if the lawsuit targets actions Tyson took "relating to" the directions of federal officers, which requires that Plaintiffs' allegations be "connected or associated with" Tyson's actions taken "pursuant to a federal officer's directions." *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (same); *Papp*, 842 F.3d at 813 (same). Here, there is a direct connection between the Petition's allegations and the actions Tyson took at the direction of federal officers.

As noted above, the Petition alleges that Tyson is liable in tort for allowing employees to continue working given the supposedly high risk of them contracting COVID-19, even though it was operating as critical infrastructure under federal directions during a national emergency. [*See* Pet. 26-29] Likewise, the Petition challenges specific measures that Tyson adopted or allegedly failed to adopt in response to the coronavirus. [*See, e.g.*, ¶ 28] But the measures that Tyson took were at the direction of federal officers to continue safe operations as critical infrastructure

during a national emergency. Any dispute that Tyson should have operated differently from the federal directions it received in a national emergency should be for the "federal—not state—courts to answer." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (federal courts must resolve "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government") (citing *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)).

**Colorable Federal Defenses**. Tyson has at least the following federal defenses to the claims in the Petition.

- **Express preemption under the Federal Meat Inspection Act ("FMIA").** The FMIA's express preemption clause preempts state-law requirements that are "in addition to" or "different than" the rigorous and extensive federal requirements under those statutes. *See* 21 U.S.C. § 678; *see also, e.g.*, 9 C.F.R. § 416.5(c) (setting federal requirements under the FMIA regarding cleanliness, protective attire, and "disease control"). As construed by the Supreme Court, "[t]he FMIA's preemption clause sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012). Plaintiffs here would use state tort law to impose additional and different requirements.

- **Preemption under the DPA and the Executive Order.** Plaintiffs' claims are also preempted by the DPA and the President's *Food Supply Chain Resources* executive order and related federal directions. Congress enacted the DPA to preserve "the security of the United States" by ensuring "the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to . . . natural or man-caused disasters." 50 U.S.C. § 4502(a)(1). The DPA grants the President wide latitude to "take appropriate steps" to maintain and enhance the "domestic

- 11 -

Case 5:21-cv-04002-LRR-KEM   Document 1   Filed 01/20/21   Page 11 of 18

critical infrastructure" threatened by "emergency conditions." *Id.* § 4502(a)(2)(C), (4). This broad grant of authority preempts any attempt by a state to impose its own regulations on "domestic critical infrastructure" industries when the President has done so under the DPA, 50 U.S.C. § 4502(a)(2)(C); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000), and provides defenses against suits like this for actions taken in compliance with orders issued under the DPA. The Petition here seeks to impose state regulation that conflicts with the President's express directives under the DPA requiring Tyson to assist the nation during a national disaster by (1) continuing to operate (2) pursuant to federal operational requirements.

**Defendants are "persons."** Tyson is a "person" under 28 U.S.C. § 1442 because the term "includes corporations." *Jacks*, 701 F.3d at 1230 n.3 (citing *Watson*, 551 U.S. at 152-53).[13]

## II. The Court also has federal question jurisdiction.

This case is properly removed under 28 U.S.C. § 1331 because it "aris[es] under" federal law. *See Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521 (8th Cir. 2020); *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 721 (5th Cir. 2017). Although Plaintiffs' causes of action are styled as state-law claims, this Court has federal question jurisdiction because the claims (1)

---

[13] Although all Defendants jointly remove this case, only one Defendant needs to establish a right to remove under 28 U.S.C. § 1442(a)(1), and "the entire case [is] deemed removable, such that [Plaintiffs'] claims against all other defendants . . . will be heard in federal court as well." *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018); see also 14C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3726 (Rev. 4th ed.) ("Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction.").

"necessarily" raise an issue of federal law that is (2) "actually disputed" and (3) "substantial," and (4) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see also Wullschleger*, 953 F.3d at 521 (removal is proper where claim pleaded under state law "implicat[es] a disputed and substantial federal issue").

**Federal issues are necessarily raised.** The Petition necessarily raises multiple, substantial federal issues. The entire thrust of the Petition is that Tyson should not have complied with express federal directives related to the national defense—*i.e.*, should have shut down or slowed production (*e.g.*, Pet. ¶ 28(I)); should have taken more or different measures than were mandated by the federal directives (*e.g.*, *id.* ¶ 28(A)-(G)); or failed to comply with federal law by allegedly failing to take certain precautions (*e.g.*, *id.* ¶ 28(H)). These issues directly implicate the "uniquely federal interest" in "civil liabilities" arising from the government's defense priorities determinations, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505-07 (1988), and none of these issues can be resolved "without reliance on and explication of federal law," *Wullschleger*, 953 F.3d at 522.

To the contrary, these federal issues are plainly and necessarily raised by the Petition, and they permeate every aspect of Plaintiffs' claims—from the measures Tyson allegedly adopted or failed to adopt (*e.g.*, Pet. ¶¶ 26-29, 31, 36; *see also id.* ¶ 16 (discussing OSHA guidance), ¶ 18 (discussing national emergency declaration), ¶ 28(H) (alleging that Tyson failed to abide by "Federal laws, rules, and guidance")), to Tyson's decision not to "slow down or otherwise alter production" in contravention of federal directives (*id.* ¶ 28(I)). Having "elected to premise" their claims on "interpretations of federal law," Plaintiffs cannot avoid this Court's jurisdiction. *Wullschleger*, 953 F.3d at 522.

**The federal issues are "substantial."** The Petition implicates federal imperatives of the highest and broadest importance: coordination of national disaster relief and the maintenance of infrastructure "essential to the national defense." 50 U.S.C. § 4511(b); *see also Scrogin v. Rolls-Royce Corp.*, No. 3:10cv442 (WWE), 2010 WL 3547706, at *3 (D. Conn. Aug. 16, 2010) ("[P]laintiffs' state tort claims give rise to serious federal interests in the government procurement contract and military operations."); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201-02 (M.D. Fla. 2006) (holding that "the federal issues [were] quite substantial" where national defense and procurement were implicated).

Moreover, "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal . . . scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs of Se. La.*, 850 F.3d at 724. The "implications for the federal regulatory scheme" of such liability—particularly where the federal scheme relates to critical infrastructure during a national emergency—"would be significant." *Id.*; *see also Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 441 (5th Cir. 2019) (noting that the substantiality requirement is satisfied where a case "put[s] the legality of a federal action in question, in a manner that would have broader ramifications for the legal system"). Thus, there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum" for these claims. *Grable*, 545 U.S. at 313; *see also Rose v. SLM Fin. Corp.*, Civ. A. No. 3:05CV445, 2007 WL 674319, at *4 (W.D.N.C. Feb. 28, 2007) ("Where a federal regulatory scheme requires private parties to undertake certain actions in order to comply with the law, the federal courts necessarily have a serious interest in examining the scope of liability that might arise as a result.").

**Actual dispute.** The federal interests are also actually disputed. *See Wullschleger*, 953 F.3d at 522 (finding federal issues actually in dispute where the plaintiffs "explicitly claim[ed] that defendants violated the FDCA, were non-compliant

- 14 -

Case 5:21-cv-04002-LRR-KEM   Document 1   Filed 01/20/21   Page 14 of 18

with FDA guidance, and that their refusal to [seek] FDA review was improper"); *Bd. of Comm'rs of Se. La.*, 850 F.3d at 723 (finding federal issues actually in dispute where the parties disagreed as to whether the defendants complied with federal law). The Petition seeks to impose state-law liability on Tyson for actions taken pursuant to federal directions, and the Petition's overarching theory is that Tyson allegedly failed to comply with federal directions in some respects and should have exceeded (or otherwise deviated from) federal directions in other respects. These issues—what was required under the *federal* orders and whether states can override the *federal* orders—constitute the central dispute in this case.

**Balance of responsibilities.** Finally, exercising jurisdiction over this case will not disturb—and, in fact, will preserve—the congressionally approved balance of federal and state judicial responsibilities. The U.S. has not faced a pandemic like this since the Spanish flu more than a century ago, and the emergency federal powers and planning directives are by their nature limited to a narrow set of circumstances. As explained above, Tyson's facilities were designated as "critical infrastructure" essential to the national defense and directed to continue operating in this national emergency. Moreover, through the DPA, Congress delegated to the President "an array of authorities" to "take appropriate steps to maintain" critical infrastructure—because the "national defense" and "security of the United States" depend upon it. 50 U.S.C. §§ 4502(a)(1), (4).

Accordingly, there is a "clear interest" in "the availability of a federal forum" for this case, which directly challenges the Executive Branch's orders related to this emergency under the DPA and other federal statutes and federal directions related to those orders. *Grable*, 545 U.S. at 319-20; *see also Bd. of Comm'rs of Se. La.*, 850 F.3d at 725 (holding that jurisdiction was appropriate because "the scope and limitations" of federal framework were at stake, and deciding "whether that framework may give rise to state law claims as an initial matter will ultimately have implications

for the federal docket one way or the other"). And exercising jurisdiction over Plaintiffs' claims "would not materially affect, or threaten to affect, the normal currents of litigation," *Grable*, 545 U.S. at 319-20, given the "rare" circumstances here.

### III. Defendants have satisfied the procedural requirements for removal.

Venue is proper in this district under 28 U.S.C. §§ 95(b)(5) and 1441(a) because the United States District Court for the Northern District of Iowa, Western Division, embraces the county (Buena Vista) in which the state court action is now pending.

Copies of all process and pleadings filed in the state case are attached hereto as **Exhibit A**. LR 81(a)(1); *see also* 28 U.S.C. § 1446(a). No orders have been filed. Defendants also provide the attached LR 81 Statement in accordance with Local Rule 81(a).

Defendants will promptly provide written notice of this filing to all adverse parties and will file a copy of this Notice of Removal with the clerk of the state court where this suit is currently pending. 28 U.S.C. § 1446(d).

### CONCLUSION

For the foregoing reasons, Defendants respectfully remove this action bearing case number LACV 033845, from the District Court for Buena Vista County, Iowa, pursuant to 28 U.S.C. §§ 1331, 1441, 1442, and 1446.

Dated: January 20, 2021            Respectfully submitted,

/s/ Kevin J. Driscoll
Kevin J. Driscoll   AT0002245
**FINLEY LAW FIRM, P.C.**
699 Walnut Street, Suite 1700
Des Moines, Iowa 50309
Telephone: 515-288-0145
Facsimile: 515-288-2724
Email: kdriscoll@finleylaw.com

Christopher S. Coleman
(*pro hac vice* forthcoming)
**Perkins Coie LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: 602.351.8000
Facsimile: 602-648.7000
Email: CColeman@perkinscoie.com

Mary Gaston
(*pro hac vice* forthcoming)
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: MGaston@perkinscoie.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2021, I have mailed by United States Postal Service and have emailed the documents to the following:

Willis J. Hamilton
**HAMILTON LAW FIRM, P.C.**
606 Ontario Street
Storm Lake, Iowa 50588

*Attorneys for the Plaintiffs*

                                /s/ Kevin J. Driscoll